# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## SOUTH BEND DIVISION

SANDSHARK Inc., Duane Mattix, and Susan Mattix,

Plaintiffs,

v.

Jeff Steininger and BEACH RAT PRODUCTS LLC,

Defendants.

Case No. 3:24-cv-570

## VERIFIED COMPLAINT

Plaintiffs, SANDSHARK Inc., Duane Mattix, and Susan Mattix, by and through their attorneys, file this Verified Complaint against Defendants, Jeff Steininger and BEACH RAT PRODUCTS LLC, and allege as follows:

## PARTIES

1.      Plaintiff SANDSHARK Inc. ("SANDSHARK") is a closely held Indiana corporation with a principal place of business in Plymouth, Indiana. SANDSHARK was formed in 2009 by Duane and Susan Mattix.  Defendant Jeff Steininger became the third shareholder of SANDSHARK in 2017.

2.      Plaintiffs Duane and Susan Mattix are shareholders of SANDSHARK and reside in Plymouth, Indiana.

3.     On information and belief, Defendant Jeff Steininger is a resident of Ohio. Jeff Steininger became a shareholder, board member, and vice president of SANDSHARK in 2017, and continues to be so to this day.  In the SANDSHARK Shareholder Agreement made effective January 1, 2017, Mr. Steininger agreed "that any dispute or breach of this agreement will be determined by the courts in Marshall County, Indiana or the Northern District of Indiana."

4.     Defendant BEACH RAT PRODUCTS LLC ("BEACH RAT") is an Ohio limited liability company believed to have been formed by or otherwise owned and/or controlled by Defendant Jeff Steininger as part of his unlawful scheme to misappropriate the trade secrets of and unlawfully and unfairly compete with SANDSHARK, as described more fully herein.  On information and belief, BEACH RAT has no members who are Indiana residents.  As explained more fully below, BEACH RAT has knowingly misappropriated SANDSHARK's trade secrets, which are located in this District, and targeted their unfair competition against SANDSHARK, whose headquarters are in this District.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1367 (supplemental jurisdiction) as this action includes claims under the Defend Trade Secrets Act, 18 U.S.C. § 1836, and related state law claims.  This Court also has jurisdiction over this action, due to diversity jurisdiction, because the parties to this action are each from different states and the amount in controversy exceeds $75,000.

6.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 and the forum selection clause in the SANDSHARK Shareholder Agreement, which mandates jurisdiction for

all disputes in the Northern District of Indiana, and because SANDSHARK's headquarters are located in the Northern District of Indiana.

## FACTUAL ALLEGATIONS

7.     SANDSHARK was formed in 2009 by Duane and Susan Mattix and sells, among other things, boat and jet ski anchors and related products.  SANDSHARK's boat and jet ski anchors have distinctive and cool looking designs that have become recognizable to the consuming public as SANDSHARK products.

8.     In 2017, after pitching Duane and Susan Mattix on his ideas for improving some of SANDSHARK's products, Jeff Steininger became a shareholder, board member, and vice president of SANDSHARK.  Jeff had his attorney draft the Shareholder Agreement made effective January 1, 2017, which includes a forum selection clause mandating jurisdiction for all disputes in this District.  Attached hereto as Exhibit 1 is a true and correct copy of the SANDSHARK Shareholder Agreement.

9.     As explained more fully below, in May 2023, Jeff Steininger agreed to a shareholder buyout, pursuant to the procedure described in the Shareholder Agreement drafted by Jeff's attorney, and is in the process of having his shares in SANDSHARK bought out by Duane and Susan Mattix.  However, to this day, Jeff continues to hold shares, he continues to be a board member, and he is still vice president and has acted as such.  For example, on information and belief, since agreeing to the shareholder buyout agreement in May 2023, Mr. Steininger has continued to monitor the books and manufacturing activities of SANDSHARK, including requesting to and being copied on emails with SANDSHARK's overseas manufacturer

and electronically logging in and accessing the financial QuickBooks information of SANDSHARK on the following dates: June 1, 2023; October 18, 2023; October 21, 2023; and February 20, 2024.

10.     Since becoming a shareholder in 2017, Jeff Steininger's work for SANDSHARK was primarily related to engineering and manufacturing activities.  SANDSHARK sent Jeff Steininger to China to meet with manufactures identified by Duane Mattix.

11.     Through his manufacturing source work for SANDSHARK, Mr. Steininger met with a company known as Mark One Manufacturing ("Mark One") and became friendly with its owners.  Mr. Steininger then began doing independent work for Mark One, and in 2019 encouraged SANDSHARK to have a meeting with Mark One to showcase their products.  This meeting was disguised as an opportunity to gain an investor for SANDSHARK, but in reality, upon information and belief, Mr. Steininger wanted to arrange a buyout of the company so as to quickly cash out of his interest in SANDSHARK.  Mark One did in fact make offers to purchase SANDSHARK, which were considered low ball offers and were declined.

12.     Mr. Steininger also sought to encourage monetization of his interest in SANDSHARK by encouraging the payment of dividends, which SANDSHARK did.  In 2023, Jeff agreed that the company should cease paying dividends and to instead start to compensate each of the three shareholders for their work as employees.  This change required each shareholder to justify the amount they sought to be paid by SANDSHARK based on the work they were doing or would do for the company.  Shortly thereafter, Mr. Steininger sought a buyout of his shares, which then resulted in the May 2023 shareholder buyout agreement, paying Jeff $1,000,000.00 for his one-third share of SANDSHARK over the course of the next five years, through 2028.

13.     Since becoming a SANDSHARK shareholder in 2017, Mr. Steininger worked collaboratively with Duane and/or Susan Mattix to develop new products, to identify problems and areas of improvement for existing products, and to work on solutions to these problems or otherwise work to create improvements to various features of SANDSHARK's products.  This collaborative design and engineering work for SANDSHARK resulted in various ideas for improvements and/or new products that were not yet finalized or released to the public.  All of this information the parties worked on and discussed about SANDSHARK's products, including the identified problems, potential solutions, and unreleased product designs and improvements, was understood by the parties to constitute confidential, proprietary, and trade secret information of SANDSHARK.

14.     For example, SANDSHARK's Ultimate Large Anchor and Ultimate XL Anchor has a handle that folds onto the side of the upper shaft.  The parties worked on and developed a new version of this handle that was a "drop in" design in which the handle would drop into the inside of the upper shaft.  This "drop in" handle design was reduced to a working prototype, but the prototype was never finalized into a finished SANDSHARK product released to the public.

15.     As another example, the current version of SANDSHARK's telescoping anchors (e.g. Ultimate Large Anchor and Ultimate XL Anchor) are a premium product in which the lower shaft is made of stainless steel, which is a strong but relatively expensive material.  The parties had been working to develop a version with an aluminum lower shaft, which is a less expensive material that would enable a lower price point, but had not yet finalized the design.

16.     As another example, SANDSHARK's telescoping anchors (e.g. Ultimate Large and Ultimate XL Anchor) have a release lever system to lock the sections in place.  The parties discussed ways to redesign this release lever system that would improve its function and reduce

the chance of jamming, for example by moving to a welded on design, using a bolt in place of a pin, and redesigning the lever to lengthen it and limit its travel, but had not yet finalized the design.

17.     As another example, SANDSHARK's SuperSport Anchor had a handle in which the left and right sections folded against the shaft independently.  The parties had discussed implementing a redesign for this handle using a geared system that would interengage the left and right side handles so that they would unfold together simultaneously but had not yet finalized the design.  They also discussed using a bolt to secure the auger, to reduce the possibility of augers breaking off.

18.     As another example, SANDSHARK's Sport Anchor is a jet ski anchor involving a number of discrete sections that can be taken completely apart and then snapped together.  The SANDSHARK team had identified a number of areas of potential improvement concerning pinched fingers, difficulty talking the pieces apart, and the plastic pieces bouncing around in the jet ski. In 2022, the Sport remake was in progress, with changes directed to button connections, joint strength, and using a bag for storage, with Duane Mattix suggesting use of an X design in the joints for strength, but the Sport redesign had not yet been finalized.

19.     Over time, Duane and Susan Mattix began to become dissatisfied with Jeff Steininger's engineering work and his inability to fix problems with the designs and/or to finalize the design improvements the parties had been discussing in a timely fashion.  Upon information and belief, beginning in about 2019, around the time of the failed buyout by Mark One, Jeff Steininger began sandbagging his efforts for SANDSHARK in an apparent effort to extract more money from SANDSHARK for himself.  For example, Mr. Steininger explained to his fellow shareholders that, due to his other commitments, he was only able to devote about 10 hours a

week to SANDSHARK but that if he were somehow compensated more, he could devote more time to SANDSHARK and thereby produce new and/or finalized designs more quickly.

20.     Upon information and belief, this sandbagging of design and engineering work continued through May 2023.  Upon information and belief, Jeff Steininger deliberately withheld design improvements and failed to finalize the refinements and redesigns for SANDSHARK's products while negotiating the buyout agreement for his shares.

21.     At a May 25, 2023 shareholder meeting, Jeff Steininger represented that he was planning to enter an unrelated business making drinkware, that he would not compete with SANDSHARK, and that $1,000,000 was an appropriate valuation for his shares.  In reliance on Jeff's promise not to compete with SANDSHARK, the parties then agreed that Duane and Susan Mattix would buy Jeff Steininger's SANDSHARK shares for $100,000 down and 60 payments of $15,000 per month, pursuant to the buyout protocol written by Jeff's attorney in the Shareholder Agreement.  Attached hereto as Exhibit 2 is a true and correct copy of the minutes of this May 25, 2023 SANDSHARK shareholder meeting.

22.     The following day, at the May 26, 2023 shareholder meeting, Jeff Steininger confirmed the shareholder buyout agreement, and explained to Jeff and Susan Mattix that, during the buyout period, he would "retain [his] shares until the sale is final" and would "still [be] part of the company" and "would want to help you guys every way I could."

23.     Duane and Susan Mattix thereafter fulfilled all material terms under this May 2023 shareholder buyout agreement, including making the initial payment of $115,000 on May 30, 2023 (representing the $100,000 down payment plus the first $15,000 installment payment) and timely payments of $15,000 per month thereafter.  These payments from Duane and Susan

Mattix were made via personal checks that were delivered to Mr. Steininger in a timely fashion, and Mr. Steininger began cashing these checks in January 2024, for Jeff's own personal reasons.

24. In his work for SANDSHARK, Mr. Steininger did not have much personal involvement in the marketing work for SANDSHARK, as this was primarily handled by Duane and Susan Mattix. In particular, on information and belief, prior to the May 2023 shareholder buyout agreement, Mr. Steininger did not work with or have any personal relationship with any of the social media influencers that SANDSHARK used to help market its products. However, as a shareholder in SANDSHARK with access to its confidential business information, such as its QuickBooks records, and through attendance at company meetings, Mr. Steininger had access to the identity of these social media influencers as well as the financial arrangements SANDSHARK had with them.

25. Through his involvement in SANDSHARK, Mr. Steininger also had access to other confidential and trade secret business information of SANDSHARK, such as which of its products were its best sellers, its manufacturing and marketing costs for each of its products, and its Amazon listing and keyword marketing strategies.

26. Upon information and belief, Jeff Steininger has formed BEACH RAT to sell copycat products to SANDSHARK's products and unfairly compete with SANDSHARK. Upon information and belief, the products BEACH RAT sells were created using the confidential, propriety, and trade secret information of SANDSHARK which Jeff Steininger had access to due to his involvement with SANDSHARK, including the unfinalized product designs that were being developed at SANDSHARK for the next generation of SANDSHARK products. Upon information and belief, Jeff Steininger improperly used his insider information to target the highest selling products of SANDSHARK in his unlawful scheme. Upon information and belief,

Jeff Steininger improperly disclosed and used the confidential, proprietary, and trade secret marketing and financial information of SANDSHARK, including disclosing this information to third parties, such as a social media influencer he learned about through SANDSHARK.

27.     For example, below are side by side pictures of the BEACH RAT Force anchor and the SANDHARK Sport anchor.

| BEACH RAT Force Anchor (https://www.beachrat.com/category/anchors) | SANDSHARK Sport Anchor |
|---|---|
|  | |

28.     The BEACH RAT Force anchor is materially identical and confusingly similar to the SANDSHARK Sport anchor, which Jeff Steininger had helped design, save that the BEACH RAT Force anchor implements the design changes that were in the works but not yet finalized for SANDSHARK, namely the use of button connections, an intersecting pattern for improved joint strength (a + pattern similar to the X pattern Duane Mattix suggested), and the inclusion of a

storage bag.  The BEACH RAT Force anchor marketing even specifically touts its "No-Pinch Anchor Release" as being "[u]nlike other anchors on the market," an obvious reference to SANDSHARK's Sport anchor which was in the process of being redesigned to address that very issue.

29.     As another example, below are side by side pictures of the BEACH RAT Titan Anchor and the SANDSHARK Ultimate Large Anchor.

| BEACH RAT Titan Anchor<br><br>(https://www.beachrat.com/category/anchors) | SANDSHARK Ultimate Large Anchor |
| --- | --- |
|  | |

30.     The BEACH RAT Titan anchor is materially identical and confusingly similar to the SANDSHARK Ultimate Large Anchor, save that the BEACH RAT Titan Anchor implements the design changes that were in the works but not yet finalized for SANDSHARK, namely the

use of the "drop in" handle, the changes to the release lever to reduce the chance of jamming, and the use of an aluminum lower shaft. The BEACH RAT Titan Anchor marketing even specifically targets SANDSHARK by touting the BEACH RAT product's "self-contained handle design" and that it "features a welded-on release bracket, not a clamp-on like our competitors. This welding prohibits mechanisms from jamming, providing you with smooth and reliable operation every time."

31.     As another example, below are side by side pictures of the BEACH RAT Extreme Anchor and the SANDSHARK Ultimate XL Anchor.

| BEACH RAT Extreme Anchor (https://www.beachrat.com/category/anchors) | SANDSHARK Ultimate XL Anchor |
|---|---|
|  | |

32.     The BEACH RAT Extreme Anchor is materially identical and confusingly similar to the SANDSHARK Ultimate XL Anchor, save that the BEACH RAT Extreme Anchor

implements the design changes that were in the works but not yet finalized for SANDSHARK, namely the use of the "drop in" handle design, the changes to the release lever to reduce the chance of jamming, and the use of an aluminum lower shaft. The BEACH RAT Extreme Anchor marketing even targets SANDSHARK by touting the BEACH RAT product's "self-contained handle design" and that it "features a welded-on release bracket, not a clamp-on like our competitors. This welding prohibits mechanisms from jamming, providing you with smooth and reliable operation every time."

33.     As another example, below are side by side pictures of the BEACH RAT Fusion Anchor and the SANDSHARK SuperSport Anchor.

| BEACH RAT Fusion Anchor (https://www.beachrat.com/category/anchors) | SANDSHARK SuperSport Anchor |
|---|---|
|  | |

34.     The BEACH RAT Fusion Anchor is materially identical and confusingly similar to the SANDSHARK SuperSport Anchor, save that the BEACH RAT Fusion Anchor implements the design changes that were in the works but not yet finalized for SANDSHARK, namely the changes to the release lever to reduce the chance of jamming, the use of an aluminum lower shaft, and a gear-driven handle opening mechanism.  The BEACH RAT Fusion Anchor marketing targets SANDSHARK by touting these features, stating that "[u]nlike our competitors who use clamp-on brackets, we employ a welded-on release bracket for superior reliability and durability," and that "[o]ur gear-driven handle opening mechanism sets us apart from the competition, offering a simple and hassle-free operation every time."

35.     As another example, upon information and belief, BEACH RAT is teasing the introduction of new products it has not yet released by using product pictures that are actual SANDSHARK products in which the SANDSHARK name and labeling has been removed and replaced with BEACH RAT labeling, further leading to consumers being confused.  An example of that is shown below, which is a true and correct screen shot of a social media posting by a Rob Chancleta.



36.     As another example of his unlawful activities, upon information and belief, Jeff Steininger/BEACH RAT sought out and engaged a social media influencer (Rob Chancleta) that SANDSHARK had previously had a marketing relationship with but that Jeff Steininger did not otherwise know to promote its products.  Furthermore, upon information and belief, Jeff Steininger has disclosed confidential, proprietary, and trade secret information regarding the marketing and finances of SANDSHARK to that social media influencer, and possibly others, as part of his scheme to unfairly compete with SANDSHARK.  For example, reproduced below are true and correct screen shots of a social media posting by Rob Chancleta that purports to reveal confidential information about the marketing and finances of SANDSHARK learned from the owner of BEACH RAT.



**Rob Chancleta** •••

Admin · 10h · 🌐

IMPORTANT ANNOUNCEMENT: in regards to these beach rat anchors identical to sandshark anchors at almost half the price. This company is only a month old and the owner has reached out to me & informed me that although they look exactly the same THEY ARE NOT IDENTICAL BECAUSE THEY ARE STRONGER IN DESIGN 😳 So how is it that they can undercut sandshark with these anchors? Well advertising costs money and his biggest advertiser Randy Cabrera/Florida Ski Riders takes a large chunk from sandshark. And he's not the only one. Here are comparison photos he sent me of his fusion anchor & the sandshark ultimate side by side. I will also soon confirm this myself. If anyone has any questions, comments or concerns let me know so I can address them with him & get back to



address them with him & get back to u. If u like using these auger style anchors the links are in the comments



🤍 Blaster Joe and 23 others    26 comments

👍 Like    💬 Comment    📨 Send    ↪ Share

**Henry Ancheta**
That's the Titan and Ultimate. And Fusion went up from $89 when you first

||| ◯ ‹

37.     Jeff Steininger breached at least the implied duty of good faith and fair dealing in the SANDSHARK Shareholder Agreement and the May 2023 shareholder buyout agreement by misusing confidential SANDSHARK information and competing with SANDSHARK while still a shareholder, officer, and/or director of SANDSHARK.  Jeff Steininger also breached his obligations to his fellow shareholders and the May 2023 shareholder buyout agreement by failing to honor the commitments he made during the May 2023 buyout negotiations, including by failing to enter into an unrelated business and failing to provide reasonable assistance to SANDSHARK and instead directly competing with SANDSHARK and misusing its confidential, proprietary, and trade secret information in the process.

38.     Jeff Steininger breached his fiduciary duties to SANDSHARK by usurping corporate opportunities, failing to disclose material information to fellow shareholders, disclosing and misusing confidential and proprietary information, and unfairly competing against SANDSHARK while still a shareholder, officer, and/or director of SANDSHARK.

**CLAIMS FOR RELIEF**

**Count I: Misappropriation of Trade Secrets (Defend Trade Secrets Act, 18 U.S.C. § 1836)**

39.     Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

40.     SANDSHARK's product designs, including its unreleased product designs, prototypes, and concepts, and confidential business information including but not limited to its finances, marketing strategies, marketing costs, vendor information and vendor costs constitute trade secrets under the Defend Trade Secrets Act.

41. Jeff Steininger misappropriated SANDSHARK's trade secrets by using them to form BEACH RAT, develop its product line, market its products, and unfairly compete against SANDSHARK.

42. As a direct and proximate result of Jeff Steininger's misappropriation, SANDSHARK has suffered and will continue to suffer damages.

**Count II: Misappropriation of Trade Secrets (Indiana Uniform Trade Secrets Act, Ind. Code § 24-2-3)**

43. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

44. SANDSHARK's product designs, including its unreleased product designs, prototypes, and concepts, and confidential business information including but not limited to its finances, marketing strategies, marketing costs, vendor information and vendor costs constitute trade secrets under the Indiana Uniform Trade Secrets Act.

45. Jeff Steininger misappropriated SANDSHARK's trade secrets by using them to form BEACH RAT, develop its product line, market its products, and compete against SANDSHARK.

46. As a direct and proximate result of Jeff Steininger's misappropriation, SANDSHARK has suffered and will continue to suffer damages.

**Count III: Breach of Contract**

47. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

48. The Shareholder Agreement and the May 2023 shareholder buyout agreement are valid and enforceable contracts under Indiana law. Each of these agreements includes an implied duty of good faith and fair dealing.

49. Jeff Steininger breached these agreements by misusing SANDSHARK's confidential information and competing with SANDSHARK while he was and is still a shareholder, officer, and/or director of SANDSHARK. Jeff Steininger also breached his contractual obligations by failing to honor the commitments he made during the May 2023 buyout negotiations, including by breaching his promise not to compete and failing to provide reasonable assistance to SANDSHARK and instead directly competing with SANDSHARK and misusing its confidential, proprietary, and trade secret information in the process.

50. As a direct and proximate result of Jeff Steininger's breach, Plaintiffs have suffered and will continue to suffer damages.

### Count IV: Breach of Fiduciary Duty

51. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

52. As a shareholder, board member, and vice president of SANDSHARK, Jeff Steininger owes fiduciary duties to SANDSHARK and its shareholders.

53.     Jeff Steininger has breached and continues to breach his fiduciary duties by usurping corporate opportunities, failing to disclose material information, disclosing and misusing SANDSHARK'S confidential information, and competing against SANDSHARK.

54.     As a direct and proximate result of Jeff Steininger's breach, Plaintiffs have suffered and will continue to suffer damages.

## Count V: Unfair Competition

55.     Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

56.     Jeff Steininger engaged in unfair competition by using SANDSHARK's trade secrets and confidential information to form BEACH RAT and compete against SANDSHARK.

57.     SANDSHARK's products are distinctive and have become recognizable to the consuming public due to their distinctiveness.  Jeff Steininger/BEACH RAT are selling copycat products that are confusingly similar in design to SANDSHARK products.

58.      As a direct and proximate result of Jeff Steininger's unfair competition, Plaintiffs have suffered and will continue to suffer damages.


## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

1.     For a declaratory judgment that Jeff Steininger has breached his fiduciary duties to SANDSHARK Inc. and that he has committed the first material breach of the shareholder

buyout agreement, resulting in no further obligations under the agreement and Jeff Steininger's expulsion from SANDSHARK Inc. and forfeiture of his shares;

2. For an award of damages in an amount to be determined at trial, including but not limited to compensatory damages, exemplary damages, and attorneys' fees;

3. For preliminary and permanent injunctive relief enjoining Defendants from using SANDSHARK Inc.'s trade secrets and confidential information and from engaging in any further competitive activities against SANDSHARK Inc.;

4. For an order requiring Defendants to return all of SANDSHARK Inc.'s trade secrets and any copies thereof in his possession, custody, or control;

5. For an order finding that, due to Jeff's breaches of the Shareholder Agreement and shareholder buyout agreement as well as his breaches of his fiduciary duties to SANDSHARK, Jeff has forfeited his shares in SANDSHARK, that Jeff is not entitled to any further payments due to his breaches, and that Jeff is required to disgorge all payments received from the inception of his breaches of the Shareholder Agreement and breaches of his fiduciary duties;

6. For an award of attorneys' fees and costs incurred in bringing this action;

7. For such other and further relief as the Court deems just and proper.


## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Dated: July 15, 2024               Respectfully submitted,


/s/John Bradshaw
John Bradshaw, IN Atty. No. 21556-49
Bradshaw Law LLC
5525 N Meridian St.
Indianapolis, IN 46208
317-490-4852
John@JBradshawLaw.com

**VERIFICATIONS**

I, Duane Mattix, under penalties of perjury, hereby certify that I have read the foregoing Verified Complaint; that the factual statements set forth in this Verified Complaint are true and correct, except for those alleged on information and belief; and that I am informed and believe that the facts alleged on information and belief are also true.

_____/s/ Duane Mattix_____

Duane Mattix


I, Susan Mattix, under penalties of perjury, hereby certify that I have read the foregoing Verified Complaint; that the factual statements set forth in this Verified Complaint are true and correct, except for those alleged on information and belief; and that I am informed and believe that the facts alleged on information and belief are also true.

_____/s/Susan Mattix_____

Susan Mattix